## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| **JOSH DOGGRELL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No.: 1:16-CV-0239-VEH** |
| | ) |
| **CITY OF ANNISTON, ALABAMA,** | ) |
| **a Municipality, and BRIAN** | ) |
| **JOHNSON, Individually and in His** | ) |
| **Official Capacity as City Manager of** | ) |
| **the City of Anniston, Alabama,** | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION AND PROCEDURAL HISTORY

On January 8, 2016, Plaintiff Josh Doggrell ("Mr. Doggrell") initiated this

lawsuit in the Circuit Court of Calhoun County against the City of Anniston (the

"City") and Brian Johnson, individually and in his official capacity as the City

Manager ("City Manager Johnson").[1] (Doc. 1-3). Mr. Doggrell's complaint contains

---

[1] Because Mr. Doggrell has separately sued the City, his official capacity claims against City Manager Johnson are redundant. *See Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1060 (11th Cir. 1992). ("Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985)) (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n.55, 98 S. Ct. 2018, 2035, n.55, 56 L. Ed. 2d 611 (1978))).

two counts. (Doc. 1-3 at 8-10 ¶¶ 31-37).[2] Count I asserts violations of Mr. Doggrell's state and federal constitutional rights of freedom of speech, association, assembly and religion. (Doc. 1-3 at 8-9 ¶¶ 31-35) against both Defendants. Count II asserts a violation of the Alabama Religious Freedom Amendment ("ARFA") against both Defendants. (Doc. 1-3 at 9-10 ¶¶ 36-37).

Defendants removed the action to federal court on February 11, 2016, on the basis of federal question over Count I and supplemental jurisdiction over Count II. (Doc. 1 at 2-3 ¶¶ 3-4). On December 2, 2016, Defendants moved for summary judgment (doc. 11) (the "Motion"). The parties have supported and opposed the Motion. (Docs. 12-15, 22-23, 26). For the reasons set out below, the Motion is due to be granted.

## II.    FACTUAL BACKGROUND[3]

Mr. Doggrell was first employed by the City of Anniston's Police Department

---

[2] All page references to Doc. 1-3 correspond with the Court's CM/ECF numbering system.

[3] Keeping in mind that when deciding a motion for summary judgment the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the Court has provided this statement simply to place the Court's legal analysis in the context of this particular case or controversy.

("APD") in April 2006. AF No. 1.1.[4] He was promoted in July 2010 to the position of Sergeant, and he was promoted again in January 2013 to the position of Lieutenant. AF No. 1.2.

Mr. Doggrell became a member of the League of the South in 1995 while he was a student at the University of Alabama. AF No. 2.1. He remained a member of the organization through July 2015. AF No. 2.2.

Michael Hill ("Mr. Hill") is the President of the League of the South and has been since its foundation in 1994. AF No. 3.1. Mr. Hill is also the organization's

---

[4] The designation "AF" within this factual background section stands for admitted fact and indicates a fact offered by Defendants that Mr. Doggrell has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case. Under appendix II of the Court's Uniform Initial Order (doc. 3) entered on February 11, 2016, "[a]ll statements of fact must be supported by specific reference to evidentiary submissions." (*Id.* at 16). For Mr. Doggrell, more specifically, this means that "[a]ny statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based." (*Id.* at 17). Consequently, whenever Mr. Doggrell has inadequately asserted a dispute over a fact that Defendants have otherwise substantiated with an evidentiary citation, the Court has reviewed the cited evidence and, if it in fact fairly supports Defendants' factual assertion, has accepted Defendants' fact. On the other hand, whenever Mr. Doggrell has adequately disputed a fact offered by Defendants, the Court has reviewed the evidence cited by Mr. Doggrell and, if it in fact fairly supports his factual assertion, has accepted Mr. Doggrell's version. The Court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Defendants' statement of undisputed material facts as set forth in doc. 12 and responded to by Mr. Doggrell in Doc. 14. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts. For example, (AF No. 1.2) would indicate the second sentence of paragraph 1 of Defendants' statement of undisputed facts is the subject of the Court's citation to the record. Similarly, the designation "AAF" stands for additional admitted fact and corresponds to Mr. Doggrell's Additional Undisputed Facts contained in Doc. 14 and responded to by Defendants in Doc. 15. Any other facts referenced by the parties that require further clarification are dealt with later in the Court's opinion.

primary spokesperson. AF No. 3.2. He has actual authority from the League of the South's Board of Directors to utilize the organization's website to communicate ideas, beliefs and principles on its behalf. AF No. 3.3. He also has "carte blanche" authority to link from his Facebook page and Twitter account to the League of the South's website. AF No. 3.4.

The League of the South's stated purpose is "to advance the cultural, social, economic, and political well-being and independence of the southern people by all honorable me[a]n[s]." AF No. 4.1. According to its President, the League of the South considers the "southern people" to be white people of southern heritage. AF No. 4.2. Black southerners are not eligible to be included within its concept of the "southern people." AF No. 4.3.

For most of his adult life, Mr. Doggrell was a firmly committed member of the League of the South. AF No. 5.1. In March 2009, Mr. Doggrell started a local chapter of the League of the South in Calhoun County, Alabama. AF No. 5.2. The Anniston Star published an article about his formation of the local chapter. AF No. 5.3. Mr. Doggrell asked the Anniston Star's reporter not to identify him as an Anniston police officer. AF No. 5.4. Mr. Doggrell made this request to the reporter because he wanted to minimize any controversy for APD. AF No. 5.5. Shortly thereafter, the City received a citizen's complaint criticizing Mr. Doggrell's involvement in the League

of the South and requesting an investigation into the matter. AF No. 6.

Former Anniston Police Chief John Dryden ("Former Police Chief Dryden"), who was interim City Manager at the time, issued a memorandum in response to the citizen's request. AF No. 7.1. In the memorandum, Former Police Chief Dryden acknowledged that a member of APD was also a member of the League of the South and asserted that the City's investigation "revealed no violations of any kind that action could be taken on." AF No. 7.2. In reaching this conclusion, Former Police Chief Dryden specifically noted that the APD officer–Mr. Doggrell–"in no way affiliated his employment with the City to his membership with this organization." AF No. 7.3.

After the City's 2009 investigation into Mr. Doggrell's involvement with the League of the South, the APD warned Mr. Doggrell to be very careful. AF No. 8.1. Mr. Doggrell confirmed that he was careful not to mix his association in the League of the South with the APD. AF No. 8.2.

In 2013, Mr. Hill invited Mr. Doggrell to speak at the League of the South's Annual National Conference that was being held in Wetumpka, Alabama. AF No. 10.1. Mr. Hill wanted Mr. Doggrell to address the relationship between local police and the League of the South and the recruitment of police officers to the organization. AF No. 10.2.

Mr. Doggrell accepted the invitation and gave a speech at the League of the South's 2013 National Conference entitled "Cultivating the Good Will of Peace Officers." AF No. 11.1. Mr. Doggrell believed that he had to identify himself as a police officer in order to have credibility to speak on the subject. AF No. 11.2.

Prior to beginning his speech, Mr. Doggrell was introduced as living in the community of Saks in Anniston, Alabama. (Doc. 12-31 at 2).[5] Mr. Doggrell submitted a biography in connection with his speech indicating that he had been a peace officer in his home city/county for sixteen years. AF No. 12.2; (*see also* Doc. 12-23 at 1 (attaching flyer detailing speakers scheduled for 2013 Annual League of the South National Conference)).

Mr. Doggrell's speech included the following statements:

- "[I]t was wonderful to go by there and show my bosses all the radicals that I was cavorting with on the weekends." (Doc. 12-31 at 5);

- "It's wonderful to be around sanity . . . it's good to be among people who think like I do for a change, even if it's just for a weekend. We are working on getting more of those people around our way of thinking." (*Id.* at 7);

- "Now, it is not easy being a League of the South member either . . . It can be hard. And let me tell you, we had a city council

[5] Doc. 12-31 is a transcription of "THE DIGITAL AUDIO/VIDEO RECORDED CONFERENCE 'CULTIVATING THE GOOD WILL OF PEACE OFFICERS,' LS National Conference 2013, Wetumpka, Alabama held on July 21, 2013." (*Id.* at 1).

member who could be best described as a small-town Jessie Jackson. We began our chapter in 2009. And there was an internal investigation [launched] against this cop who had founded a local hate group. And I was cleared for that, and hopefully won't have to put up with that again. And that city councilman, by the way, has been voted out of office as well. So there are – In my department, they have been very supportive of me. I have somehow, been promoted twice since I have been there. So these folks are not necessarily always against us. I want to leave you with that impression. (Doc. 12-31 at 8-9, 9-10);

- "Calhoun County has several police agencies. I work at Anniston, which I'll go ahead and go on record. Nothing I say here today is necessarily the views of the Anniston Police Department. I speak only as an individual and not an employee of that agency." (*Id.* at 13);[6]

- "The vast majority of men in uniform are aware that they are Southerners and kith and kin comes before illegal national mandates." (*Id.* at 23);

- "You may ask how many police officers I have recruited to the League. Well, not many . . . But continuously, like Dr. Hill said last night in our state meeting, it is a grind . . . Some of those same people who said ten years ago were telling me how crazy I was, this week are telling me, 'I am this close to where you are at.' Okay? We have got to keep working on that and stay the course." (*Id.* at 23, 24);

- "[Police officers] are the kind of people we will need in this kind of organization. These are the successful ones that can be counted

_____

[6] As Police Chief Shane Denham ("Police Chief Denham") testified during Mr. Doggrell's Civil Service Board hearing, he had the impression that these comments made by Mr. Doggrell during the 2013 League of the South National Conference were uttered in a joking way. (Doc. 12-2 at 36 at 142 (The first set of page numbers to Doc. 12-2 corresponds with the Court's CM/ECF numbering system.)). Police Chief Denham recalled "actually some laughing and chuckling going on during that." (Doc. 12-2 at 36 at 142-43).

on to be a warrior in the battles to come." (*Id.* at 33);

- "[B]y the way, Wayne. But Wayne Brown is here, a lieutenant at the Anniston Police Department. He accompanied me to a meeting in Cullman; and on the way there, he was asking me, he said, 'What is the magic bean,' as he put it, 'that would arouse our people to see exactly what was happening to them and how necessary the step of secession is?' And I told him I considered that, not only a good question but perhaps the million dollar one: What will it take? We see all this, and we still see the zombies walking around accepting it. What – What would it take?" (Doc. 12-31 at 39);

- "By and large, our lawmen of Southern justice are good people with good intentions. They are just as susceptible to being swayed to our side and our views as any other southerner, and I would say even more so." (*Id.* at 41);

- "I went through that internal investigation and was cleared. The department I work at has been very supportive about that. They are not all on board, now, but they have been very supportive. They are just – They are like other southerners. They have that fear of taking this step. What's it going to do to me? What's it going to do to my job? . . . It's the same thing. They are southerners just like others. (*Id.* at 48-49, 49); and

- "Everybody in here, something starts swirling back around about it. You know, "This guy works at the police department, founder of a local hate group." And I went in and told the chief last year, I said . . . , "Is there anything you want to ask me?" I said, "I promise you that whatever I do I want to exercise good judgment about it. I am not going to sell out my position with a league of something that I believe in strongly. If it came down to it, I would choose the League." And I said, "Is there anything you want to ask me? He said, "You just answered every question I have." And he even said this. He said, "We pretty much think like you do." They are just – They are like everybody else you come into

8

contact with that's not here today. They are just not quite ready to take that step. But like I said earlier, they are much closer than they were ten or 15 years ago." (*Id.* at 49, 49-50).

AF No. 13.

After giving his speech in 2013, Mr. Doggrell began to notice a shift or change in the League of the South. AF No. 9.1. Certain people were being placed in leadership positions that Mr. Doggrell felt did not represent the League of the South or southern nationalism well. AF No. 9.2. People with White Nationalist and neo-Nazi beliefs were becoming associated with the League of the South and were becoming more prevalent. AF No. 9.3. According to Mr. Doggrell, "the tone and language and rhetoric ha[d] gotten vile to a degree." AF No. 9.4. Mr. Doggrell was afraid that the movement was being hijacked. AF No. 9.5.

The City first learned about Mr. Doggrell's 2013 speech when a person who identified herself as being associated with the Southern Poverty Law Center ("SPLC") called Anniston Police Chief Denham in late-May, early-June of 2015. AF No. 14. City Manager Johnson was notified of Mr. Doggrell's speech at that same point in time. AF No. 15.1.

City Manager Johnson had never heard of the League of the South. AF No. 15.2. He did not know Mr. Doggrell, either. AF No. 15.3. Initially, City Manager Johnson made no decision as to how the City would respond other than to investigate

the matter internally. AF No. 15.4.

City Manager Johnson spoke to the Police Chief to ask for background on the League of the South, Mr. Doggrell's membership in the organization, and Mr. Doggrell's personnel record. AF No. 16.1. City Manager Johnson also spoke with the City's HR Director as to the personnel concerns relating to the allegation that a member of the police force may be involved in an organization that could be construed as a hate group. AF No. 16.2. He directed both the Police Chief and HR Director to investigate the situation and report how it might impact Mr. Doggrell's employment with the City. AF No. 16.3.

On June 17, 2015, the SPLC published an article on its Hatewatch Blog entitled, "Anniston Police Department Has Two Hate Group Members on the Force." AF No. 17.1. The article cited several of Mr. Doggrell's statements made during his speech to the League of the South's 2013 National Conference, which had been posted to YouTube, including Mr. Doggrell's purported conversation with former Police Chief Layton McGrady ("Former Police Chief McGrady")[7] in 2012 about Mr. Doggrell's League of the South affiliations. AF No. 17.2.

Prior to the SPLC's June 17th publication, Mr. Doggrell was never hindered

_____

[7] According to Former Police Chief McGrady's testimony given at the Civil Service Board hearing, he was last employed with the APD on February 10, 2013, and served in the position of police chief for three years–starting in 2010. (Doc. 12-2 at 2 at 8).

in his advancement in his career with APD because of his association with the League of the South. AF No. 18.3. Mr. Doggrell suffered no adverse employment action in the time period between when Defendants first received notice of his speech and the SPLC's June 17th publication. AF No. 18.1. Mr. Doggrell does not dispute that Defendants' initial response after receiving notice of his speech was measured. AF No. 18.2.

The SPLC's article and the posting of a related YouTube video had a tremendous impact in the community. AF No. 19.1 Concerning the video, more particularly, it depicted the current APD, Mr. Doggrell, and Lt. Wayne Brown ("Lt. Brown") as being connected with the KKK's actions in the 1960s in burning buses of Freedom Riders. AAF No. 11.1. Police Chief Denham testified that he believed that the SPLC edited the video footage in this manner to inflame racial tensions. AAF No. 11.1; (*see* Doc. 12-2 at 27 at 108 ("It was very obvious to me that the SPLC was trying to inflame the situation.")).

Police Chief Denham also testified that it "was not like anything I had ever seen before . . . ." AF No. 19.2. "Very angry and very disgusted" people started showing up in APD's lobby, and APD started receiving phone calls and emails about it. AF No. 19.3. A large portion of the complaints were directed at the APD as a whole, "as in you have a racist department, you follow the beliefs of this organization,

League of the South, and you are in line with them, as evidenced by the speech that one of your lieutenants gave." AF No. 19.4.

City Manager Johnson's first response to the public outcry was to place both Mr. Doggrell and Lt. Brown, who Mr. Doggrell had identified during the 2013 speech as a fellow ADP officer who supported the League of the South, on paid administrative leave. AF No. 20.1. He did so for their own safety, the safety of their fellow officers, and to allow time for an internal investigation. AF No. 20.2. Tensions in the community were pretty high, and the Police Chief believed that there were "absolutely" real safety concerns. AF No. 20.3.

Following the SPLC's publication, the City looked into the League of the South by reference to its readily available web page and social media presence, which revealed troublesome materials. AF No. 21.1. For instance, the organization was promoting a return to segregation, overtly disparaging black Americans, promoting white supremacy and the inferiority of black Americans (in the context of a threatened race war), and espousing plainly racist and inflammatory rhetoric. AF No. 21.2. For example, in a social media posting by "Michael Hill @MichaelHill51[,]" it states: "Let's see, who's killed more white Americans today, ISIS or feral negroes? First things first, people! leagueofthesouth.com." (Doc. 12-11). Accompanying this post made by Mr. Hill is a copy of the League of the South's logo. *Id.*

Lt. Brown was in fact present during Mr. Doggrell's speech at the League of the South's 2013 National Conference. AF No. 22.1. In actually though, he had very limited involvement with the organization in 2013 and was not a member in 2015. AF No. 22.2. Lt. Brown attended a meeting at Mr. Doggrell's invitation in Cullman, Alabama in 2013. AF No. 22.3. He purchased an annual membership to attend the 2013 National Conference, which he never renewed. AF No. 22.4. Lt. Brown then attended an event with Mr. Doggrell in Vidalia, Georgia in August 2013. He withdrew from the organization after being exposed to some of the views espoused by its members. AF No. 22.5. Lt. Brown perceived a radical element within the organization. AF No. 22.6.

On June 18, 2015, Police Chief Denham held a meeting at the Justice Center to address the public outcry. AF No. 25.1. He communicated with community leaders, civil rights activists, and concerned citizens who expressed that they had lost confidence in the police department. AF No. 25.2. He tried to get people to understand that the SPLC's publication did not expose a department-wide issue, but rather a more limited issue. AF No. 25.3.

In Police Chief Denham's assessment, Mr. Doggrell's 2013 speech was very damaging to the APD because Mr. Doggrell gave the false impression that the APD supported the League of the South and condoned his activities in furtherance of the

organization. AF No. 26.1. Ultimately, Police Chief Denham determined that Mr. Doggrell's continued employment with the City was impossible. AF No. 26.2.

City Manager Johnson also engaged in a number of meetings with community representatives, specifically from the minority community, in an effort to refute the implication that there was a pervasive problem within the police department and to prevent further erosion of the public's trust in the department. AF No. 27.1. City Manager Johnson received information relating to the public's reaction through his own direct communications, staff members, Police Chief Denham, and elected officials. AF No. 27.2.

The City concluded in its investigation that Mr. Doggrell had misrepresented the extent to which the APD supported his association and activities with the League of the South. AF No. 29.1. More specifically, Mr. Doggrell's statements during his 2013 speech about APD's prior investigation into his association with the League of the South, the Police Chief's support of his association, and Mr. Doggrell's apparent recruitment of police officers created the perception within the community that there was a "department wide pervasive problem." AF No. 27.3. City Manager Johnson perceived the community as being a "powder keg." AF No. 27.4.

The City received numerous media requests from local, national and international media outlets following the SPLC's publication. AF No. 28.1. The City

received press inquiries from NBC News in New York and CNN in Atlanta, as well as WIAT 42 in Birmingham, WVTM 13 in Birmingham, Alabama Heritage Communications, and the Anniston Star, among others. AF No. 28.2.

On June 18, 2015, "Anniston, Alabama: City's Police Department Places 2 Officers on Leave After Hate-Group Allegations" was the number one trending topic on Facebook. AF No. 28.6. The APD's Facebook account had to be shut down because of the extraordinary social media response, including many vitriolic and salacious postings. AF No. 28.3. The APD's Facebook account had 27,000 followers at the time and served as a lifeline between the department and the community. AF No. 28.4. APD's Facebook also served as a useful tool in the department's efforts to solve crimes. AF No. 28.5.

During his tenure as Police Chief, Chief McGrady promoted Mr. Doggrell to sergeant and then lieutenant. AF No. 30.1. Former Police Chief McGrady did not consider Mr. Doggrell's association with the League of the South in relation to those promotions because it did not affect his job performance or the APD. AF No. 30.2. At the time of those promotions, Former Police Chief McGrady had no reason to believe that Mr. Doggrell had associated his membership in the League of the South with his position as a police officer. AF No. 30.3.

After the SPLC's publication, the City also looked at Mr. Doggrell's public

Facebook profile and identified social media activity that violated its policy against harassment. AF No. 31.1; AF No. 31.2. Mr. Doggrell's public Facebook profile displayed an image of a white "not-equal" sign with a black background that, on its face, conveyed the message that blacks and whites are not equal. (Exhibit 1, pg. 156-157) and (Exhibit 1-10). This image was depicted along with confederate symbols and a picture of Nathan Bedford Forrest, which solidified its racially offensive message. (Exhibit 1, pg. 157-159) and (Exhibit 1-11). Mr. Doggrell's public Facebook profile also included three photographs of him together with Michael Hill, one of which displayed the message, "Southern Nationalists: 100% Diverse" with a banner reading "SECEDE" in the background.

Prior to making a decision on how to handle Mr. Doggrell's employment, City Manager Johnson received a report from APD that Mr. Doggrell was unwilling to denounce the League of the South. AF No. 32.1. According to Mr. Doggrell, he was asked by the APD whether he would "outright denounce" the League of the South and "throw them under the bus," to which he responded: "Well, that's not going to happen." AF No. 32.2. Mr. Doggrell also stated in writing: "Friday afternoon the carrot was dangled by Internal Affairs. Would I be willing to flush the League entirely in order to save my job[?] The answer was a swift no." AF No. 32.3.

Although Mr. Doggrell disagreed with the outcome of the investigation, City

Manager Johnson determined that the revelation of Mr. Doggrell's 2013 speech and his conduct had "unequivocally" damaged the public's perception, confidence and trust in the City's police department and, "without a doubt", interfered with Mr. Doggrell's ability to carry out the duties of his job and the APD's ability to carry out its mission and operations. (Doc. 12-2 at 51 at 204; *id.* at 52 at 207-08). In an effort to remedy the damage to APD's reputation, its officers underwent training by the Department of Justice's Community Relations Service on policing and relationships with the minority community. (Doc. 12-2 at 52 at 211-12). The controversy surrounding the situation also served as a catalyst for the United States Attorney for the Northern District of Alabama and her office to become involved in the affairs and operations of APD. (Doc. 12-2 at 52 at 212).

City Manager Johnson decided on June 19, 2015, to terminate Mr. Doggrell's employment with the City. AF No. 34.1. Ultimately, like Police Chief Denham, City Manager Johnson considered Mr. Doggrell's continued employment and service to the City to be impossible. AF No. 34.2. The formal charges brought by the City against Mr. Doggrell were:

> [Mr.] Doggrell has engaged in conduct, activities, and speech that has (1) impeded the performance of his duties as a sworn peace officer, (2) interfered and disrupted the operation and efficiency of [the] APD and the City, (3) damaged the public perception, confidence and trust in him, as a sworn peace officer, [the] APD and the City, (4) falsely

17

implicated and associated [the] APD and the City with divisive, offensive and prejudicial beliefs and objectives; and (5) caused and exacerbated racial tensions and distrust in [the] APD and the City. [Mr.] Doggrell also violated the following policies and procedures of [the] APD and the City:

1.  Engaging in conduct unbecoming of a sworn officer of the Anniston Police Department and of an employee of the City of Anniston in violation of Anniston Police Department Standard Operating Procedure 500.090(X) and the City of Anniston Policies and Procedures Manual, Employee Conduct and Discipline.

2.  Associating with person and organizations of ill repute outside the scope of official police duties, including those that espoused and advocated divisive, offensive and prejudicial beliefs and objectives, in violation of Anniston Police Department Standard Operating Procedure 500.090(Q);

3.  Violating the City of Anniston's Anti-Harassment Policy, including the use of social media in a harassing, divisive, offensive and prejudicial manner.

4.  Participating in or conducting speeches, lectures, or public relations programs in his capacity as an APD officer without prior approval of the Chief of Police in violation of Anniston Police Department Standard Operating Procedures 400.020, Activities on Behalf of Police Department (On/Off Duty).

(Doc. 12-51 at 2-3).[8]

City Manager Johnson held a press conference on June 19, 2015, to announce his decision to end Mr. Doggrell's employment because he feared that the turmoil in the community could worsen significantly and that hostile actions could develop over the weekend if the message was not clearly communicated. AF No. 35.1. For example, Councilman Seyram Selase reported to City Manager Johnson that the minority community was a powder keg that could blow up at any moment. AF No. 35.2. Councilman David Reddick also testified: "It was like another Ferguson in Anniston. It had that feeling that it could break out at any moment." AF No. 35.3.

Mr. Doggrell concedes that there was at least some potential for race riots in Anniston similar to what occurred in Ferguson and Baltimore. AF No. 35.4. Mr. Doggrell also acknowledges that there were factors in play that were beyond his and the City's control. AF No. 35.5.

After announcing his decision to terminate Mr. Doggrell's employment, City

---

[8] This summary is taken from the City's Formal Charge of Termination dated July 9, 2015, that was provided by City Manager Johnson to the Civil Service Board in connection with Mr. Doggrell's administrative appeal. (Doc. 12-51 at 1). Defendants have indicated in their Exhibit Index that Exhibit 6 is a Notice of Disciplinary Action giving Mr. Doggrell written notification of the City's decision to discharge him. (Doc. 12-1 at 6). The Court has reviewed Exhibit 6 (doc. 12-49) on CM/ECF and determines that the attached evidence is instead a memo from City Manager Johnson to Mr. Doggrell placing him on administrative leave while the City "evalua[tes] [the] allegations made on the Southern Poverty Law Center's Hatewatch Blog dated June 17, 2015." (Doc. 12-49 at 1). Further, the Court has been unable to locate the City's written Notice of Disciplinary Action elsewhere in the record.

Manager Johnson delegated the implementation of his decision, in accordance with the applicable Civil Service laws and regulations, to the City's HR Director and attorney. AF No. 36. On June 25, 2015, City Manager Johnson provided Mr. Doggrell with a written Notice of Disciplinary Action notifying Mr. Doggrell of the City's decision to terminate and discharge his employment and setting forth the grounds for the City's decision.[9] AF No. 37.

Pursuant to his rights as a Civil Service employee, Mr. Doggrell appealed City Manager Johnson's decision to terminate his employment and requested a hearing before the Civil Service Board. AF No. 38. As required, the City then filed a Formal Charge of Termination with the Civil Service Board for the termination of Mr. Doggrell's employment. AF No. 39.

After holding a hearing over a period of three non-consecutive days, during which Mr. Doggrell was afforded an opportunity to face his accusers and defend himself against the charge for his termination with the aid of his own legal counsel, the Civil Service Board issued a decision affirming the City's decision to terminate Mr. Doggrell's employment. (Doc. 12-52 at 1).

---

[9] As for Lt. Brown, Police Chief Denham ultimately gave him three options: Lt. Brown could be terminated, demoted, or he could retire. Because Lt. Brown knew if he took a demotion it would negatively affect his retirement, Lt. Brown decided to retire effective June 19, 2015. (Doc. 12-42 at 7, 25-27).

Mr. Doggrell appealed this adverse Civil Service Board decision to the Circuit Court of Calhoun County, 11-CV-2015-900559, (the "State Court Appeal"). That appeal contained a "Direct Complaint and/or Collateral Complaint" against the City and City Manager Johnson and included Counts II and III that are identical to Counts I and II here. Defendants filed a Motion To Dismiss those counts for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) on the basis that such legal issues were beyond the record that was made before the Civil Service Board and, therefore, beyond the review on appeal. (Doc. 14-7 at 1, 4-5). On December 24, 2015, the Circuit Court granted Defendants' Motion To Dismiss Counts II and III without prejudice. *See* State Court Appeal at doc. 17 (accessed on alacourt.com on Sept. 13, 2017). Count I of the State Court Appeal remains pending and, earlier this year, it was transferred to a non-jury docket. *See id.* at doc. 19 (May 19, 2017) (accessed on alacourt.com on Sept. 13, 2017).

The dismissal of Counts II and III without prejudice in the State Court Appeal led to Mr. Doggrell's filing of a second lawsuit against Defendants. That lawsuit is the action that is now pending before this Court.

## III.   STANDARDS

### A.   Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there

is no genuine dispute as to any material fact and the moving party is entitled to

judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*,

477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 2265 (1986) ("[S]ummary

judgment is proper if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law.") (internal quotation marks omitted). The party requesting summary

judgment always bears the initial responsibility of informing the court of the basis for

its motion and identifying those portions of the pleadings or filings that it believes

demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323,

106 S. Ct. at 2553. Once the moving party has met its burden, Rule 56(c) requires the

non-moving party to go beyond the pleadings in answering the movant.[10] *Id.* at 324,

106 S. Ct. at 2553. By its own affidavits – or by the depositions, answers to

interrogatories, and admissions on file – it must designate specific facts showing that

there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which

are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505,

---

[10]  When *Celotex* was decided FED. R. CIV. P. 56(e) encompassed this express
requirement, but now this concept is covered by the language provided for under FED. R. CIV. P.
56(c).

2510, 91 L. Ed. 2d. 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249, 106 S. Ct. at 2511.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact."

*Id.* (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358, 116 S. Ct. 2174, 2183, 135 L. Ed. 2d 606 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

### B. Qualified Immunity

City Manager Johnson asserts that qualified immunity bars Mr. Doggrell's federal claims brought against him in his individual capacity. "The defense of

qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks omitted) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)). "To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority." *Id.* at 1234 (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)).

This is a two-part test. Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity, would have fallen with[in] his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Next, the defendant must prove that he or she was "executing that job-related function–that is, pursuing his job-related goals–in an authorized manner." *Id.* at 1267. "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.[11]

---

[11] In the context of this case, no dispute exists that City Manager Johnson was acting within the scope of his discretionary authority when he decided to terminate Mr. Doggrell's employment as a police officer with the City.

Until 2009, the Supreme Court had required a two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001), *modified in application by Pearson v. Callahan*, 555 U.S. 223, 227, 129 S. Ct. 808, 813, 172 L. Ed. 2d 565 (2009) (holding that "*Saucier* procedure should not be regarded as an inflexible requirement"). Under the *Saucier* test, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513, 153 L. Ed. 2d 666 (2002).

If, under the plaintiff's allegations, the defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Cottone*, 326 F.3d at 1358 (quoting *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156). The "clearly established" requirement is designed to assure that officers have fair notice of the conduct which is proscribed. *Hope*, 536 U.S. at 739, 122 S. Ct. at 2515. This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206, 121 S. Ct. at 2158.

The "unlawfulness must be apparent" under preexisting law.[12] *Anderson v.*

_____

[12]   Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this case. *See Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) ("In this circuit, rights are 'clearly established' by decisions of the Supreme Court, this

*Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987) (citing

*Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 1097-98, 89 L. Ed. 2d 271

(1986)). Therefore, a temporal requirement exists related to this inquiry. More

particularly, a plaintiff must show that a reasonable public officer would not have

believed her actions to be lawful in light of law that was clearly established at the

time of the purported violation. *See Anderson*, 483 U.S. at 639, 107 S. Ct. at 3038

("[W]hether an official protected by qualified immunity may be held personally liable

for an allegedly unlawful official action generally turns on the 'objective legal

reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly

established' <u>at the time</u> it was taken[.]") (emphasis added) (citation omitted);

*Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583

(2004) ("If the law <u>at that time</u> did not clearly establish that the officer's conduct

would violate the Constitution, the officer should not be subject to liability or, indeed,

even the burdens of litigation.") (emphasis added); *Brosseau*, 543 U.S. at 198, 125

S. Ct. at 599 ("Because the focus is on whether the officer had fair notice that her

conduct was unlawful, reasonableness is judged against the backdrop of the law <u>at the</u>

<u>time</u> of the conduct.") (emphasis added); *see also Johnson v. Clifton*, 74 F.3d 1087,

---

court, or the highest court of the state in which the case arose." (citing *Hamilton v. Cannon*, 80
F.3d 1525, 1532 n.7 (11th Cir. 1996))).

1093 (11th Cir. 1996) ("We know of no [preexisting] case which might have clearly told Clifton that he could not take the disciplinary action indicated by an investigation which was initiated before he even knew about the allegedly protected speech, and in circumstances where the public concern implication was doubtful.").

However, the *Saucier* framework was made non-mandatory by the Supreme Court in *Pearson*, 555 U.S. at 236, 129 S. Ct. at 818, in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." Thus, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's modification of *Saucier*'s analytical process, the substantive analysis remains unchanged; an officer is entitled to qualified immunity protection as long as he "could have believed" his conduct was lawful. *Hunter v. Bryan*, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991). Therefore, to deny immunity, a plaintiff must affirmatively demonstrate that "no reasonably competent officer would have" acted as the public official did. *Malley*, 475 U.S. at 341, 106 S. Ct. at 1096.

## IV.   ANALYSIS

### A.   Claims Abandoned by Mr. Doggrell

In their Notice of Removal, Defendants included the following footnote about

Count I of Mr. Doggrell's complaint:

> Plaintiff did not specify the cause of action by which he asserts the claim alleged in Count I. Plaintiff has, however, pled the basic elements of a cause of action under Section 1983. *See Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987) ("To sustain a cause of action based on section 1983, the [plaintiff] must establish two elements: (1) that [he] suffered a deprivation of 'rights, privileges or immunities secured by the Constitution and laws' of the United States, and (2) that the act or omission causing the deprivation was committed by a person acting under color of law."); *compare* D. 1-3, ¶¶ 27, 29 and 33 (alleging that Defendants violated Plaintiff's federal constitutional rights) and ¶ 5 (alleging that Defendants acted under the color of law). While Plaintiff also alleges violations of his rights under the Constitution of the State of Alabama, there is no private cause of action for monetary damages based on those alleged violations. *See, e.g., Matthews v. Alabama Agric. & Mech. Univ.*, 787 So. 2d 691, 698 (Ala. 2000); *Ross v. Alabama*, 893 F. Supp. 1545, 1555 (M.D. Ala. 1995); *Tomberlin v. Clark*, 1 F. Supp. 3d 1213, 1234 (N.D. Ala. 2014). Plaintiff's claim in Count I must, then, arise under federal law.

(Doc. 1 at 2 n.1). Defendants inserted a similarly-worded footnote in their opening

summary judgment brief. (Doc. 12 at 4 n.1).[13]

In opposing summary judgment, Mr. Doggrell has made no attempt to refute

Defendants' characterization of Count I or to challenge the cases cited by Defendants

---

[13]  All page references to Doc. 12 correspond with the Court's CM/ECF numbering system.

to show that Count I must arise (only) under federal law.[14] Therefore, to the extent that Mr. Doggrell has attempted to assert any <u>state</u> constitutional claims in Count I, a dismissal on the grounds of abandonment is appropriate because he has omitted any reference to them in his opposition brief. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.,* 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Hudson v. Norfolk Southern Ry. Co.,* 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (citing *Dunmar*, 43 F.3d at 599)); *cf. McMaster v. United States,* 177

---

[14] When Defendants put him on notice of these pleading inadequacies in their removal petition, Mr. Doggrell never sought leave to amend his complaint to provide a more definite statement of his claims and/or to replead Count I in a manner that comports with FED. R. CIV. P. 8(a)(2) (indicating that "a pleading that states a claim for relief must contain: . . . a short and plain statement of the claim showing that the pleader is entitled to relief[.]").

F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").

Further, in addressing the merits of Mr. Doggrell's federal claim contained in Count I, Defendants have focused primarily upon retaliation for protected speech under the First Amendment. (Doc. 12 at 22). In a footnote, Defendants acknowledge that Mr. Doggrell "also alleges that his termination was retaliation for his exercise of his right to Freedom of Religion[,]" but contends that "[t]he undisputed facts . . . establish that his religious activity, if any, was not a motivating factor in his termination." (Doc. 12 at 22 n.4). Defendants then detail the absence of any evidence tending to show a religious-driven motivation for Mr. Doggrell's discharge. *Id.* Defendants finally assert that even if Mr. Doggrell's posting of a white "not-equal sign" with a black background to his public Facebook page can constitute religious activity because it symbolizes his opposition to homosexual marriage (as opposed to

the image having any racial meaning),[15] such a factor was not a substantial one for his discharge "and the Defendants would have taken the same action in its absence." *Id.*

In his opposition, Mr. Doggrell does not address any of these issues raised by Defendants or resist the dismissal of any federal claims except for retaliation based upon free speech and association under the First Amendment. (*See generally* Doc. 14 at 22–32 (omitting any discussion of Defendants' violating a federal religious and/or assembly right)).[16] Therefore, the Court concludes that Mr. Doggrell has abandoned any federal claim in Count I that is premised upon religion or assembly.

## B. Mr. Doggrell's Free Speech Retaliation Claim Is Legally Deficient.

A public employee generally has "no right to object to conditions placed upon the terms of employment–including those which restricted the exercise of constitutional rights." *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S. Ct. 1951, 1957, 164 L. Ed. 2d 689 (2006) (quoting *Connick v. Meyers*, 461 U.S. 138, 143, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)). Concerning free speech more specifically, while a governmental entity may not terminate the employment of "a public employee in

---

[15] *See* Doc. 1-3 at 8 ¶ 26 (alleging in complaint that "[o]ne of the posts that the Defendants claimed was harassment involved a discussion that same sex marriages were not equal to opposite sex marriages, a religious view that the Plaintiff has").

[16] All page references to Doc. 14 correspond with the Court's CM/ECF numbering system.

retaliation for speech protected under the first amendment, a public employee's right to freedom of speech is not absolute." *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989) (citing *Rankin v. McPherson*, 483 U.S. 378 (1987)).

At the same time, "[t]he Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti*, 547 U.S. at 417, 126 S. Ct. at 1957. In certain instances, a public employee may speak, not as a public official during the course of his or her duty, but as a private citizen on matters of public concern. *Id.*

In *Battle v. Bd. of Regents for Georgia*, 468 F.3d 755 (11th Cir. 2006), the Eleventh Circuit set out the *prima facie* elements that a public employee must show to support a protected speech-based retaliation claim under the First Amendment:

> (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee.

468 F.2d at 760; *see also Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989) (similar) (citing *Pickering v. Board of Ed. of Tp. High School*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968); *Atkins v. Fulton County*, 420 F.3d 1293, 1303 (11th Cir. 2005) (similar). "Once the employee succeeds in showing the

preceding factors, the burden then shifts to the employer to show, by a preponderance of the evidence, that 'it would have reached the same decision . . . even in the absence of the protected conduct.'" *Battle*, 468 F.3d at 760 (quoting *Anderson v. Burke County*, 239 F.3d 1216, 1219 (11th Cir. 2001) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286, 97 S. Ct. 568, 576, 50 L. Ed. 2d 471 (1977))).

The Supreme Court, in *Pickering*, *supra*, and more recently in *Garcetti*, *supra*, has articulated a two-step inquiry regarding whether the speech of a public employee is constitutionally protected. "Both steps are questions of law for the court to resolve." *Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1159 (11th Cir. 2015) (citing *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015)), *cert. denied*, 136 S. Ct. 1838, 194 L. Ed. 2d 829 (2016). "If the employee spoke as a citizen and on a matter of public concern, 'the possibility of a First Amendment claim arises,' and the inquiry becomes one of balance, *see Garcetti*, 547 U.S. at 418, 126 S. Ct. at 1958; on the other hand, if the employee spoke as an employee and on matters of personal interest, the First Amendment is not implicated, and 'the constitutional inquiry ends with no consideration of the *Pickering* test[.]'" *Alves*, 804 F.3d at 1160 (quoting *Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007)).

Here, Defendants have foregone a discussion of whether Mr. Doggrell's League of South speech satisfies the public concern component and have, for the purpose of summary judgment, proceeded to the second prong. (*See* Doc. 12 at 24-25 ("Even if the court were to assume in this case that Plaintiff, in giving his speech in 2013 to the League of the South's national conference, was speaking as a citizen on matters of public concern, the undisputed facts establish that Defendants had an adequate justification for terminating Plaintiff's employment.")); *see also Garcetti*, 547 U.S. at 418, 126 S. Ct. at 1958 ("If the answer [to the first question] is yes, then the possibility of a First Amendment claim arises[,] and [t]he [second] question becomes whether the relevant government entity had an adequate justification [given its interests as an employer] for treating the employee differently from any other member of the general public." (citing *Pickering*, 391 U.S. at 568, 88 S. Ct. 1731)). Thus, the Court likewise turns to an evaluation of the second prong.

"The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." *Garcetti*, 547 U.S. at 419, 126 S. Ct. at 1958 (citing *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2964, 33 L. Ed. 2d 570 (1972)). Nonetheless, "[t]he problem in any case is to arrive at a balance between the interests of the [police officer], as a citizen, in commenting upon matters

of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 563, 88 S. Ct. at 1735.

The Eleventh Circuit has articulated several factors to inform the Court's analysis of the second step: "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293 (11th Cir. 2000). As Defendants correctly observe with respect to the first factor, "it is well settled that a law enforcement agency has a 'heightened need for order, loyalty, morale and harmony, <u>which affords a police department more latitude in responding to the speech of its officers than other government employers</u>.'" (Doc. 12 at 24 (emphasis added) (quoting *Oladeinde*, 230 F.3d at 1293)); *see Hansen v. Soldenwagner*, 19 F.3d 573, 577 (11th Cir. 1994) ("[T]he *Pickering* balance is also affected . . . by the special concerns of quasi-military organizations such as police departments."); *see also Busby v. City of Orlando*, 931 F.2d 764, 774 (11th Cir. 1991) ("In quasi-military organizations such as law enforcement agencies, comments concerning co-workers' performance of their duties and superior officers' integrity can 'directly interfere[] with the confidentiality, esprit de corps and efficient operation of the [police department].'" (alteration in

original) (quoting *Egger v. Phillips*, 710 F.2d 292, 327 (7th Cir. 1983) (*en banc*) (Coffey, J. concurring in part), *receded from on other grounds as stated in Feit v. Ward*, 886 F.2d 848, 855-56 (7th Cir. 1989))); *cf. also McMullen v. Carson*, 754 F.2d 936, 939 (11th Cir. 1985) (holding that a sheriff acted lawfully in protecting the interests of his office when he fired a clerical employee who was interviewed on a locally televised news broadcast as a recruiter for the Ku Klux Klan and recognizing that "law enforcement requires mutual respect, trust, and support").

Given the significant latitude afforded to law enforcement agencies under *Pickering* and considering the undisputed facts under the foregoing factors (particularly the governmental functioning and speech context factors) there is no room for doubt that Defendants acted with adequate justification when they fired Mr. Doggrell for the impediment his League of the South speech caused to the APD. The League of the South is a controversial organization that purportedly seeks to advance the cultural, social, economic, and political well-being and independence of the southern people, but allows no black members. As conceded by Mr. Doggrell on summary judgment, the League of the South promotes a return to segregation, overtly disparages black Americans, believes in white supremacy and the inferiority of black Americans (in the context of a threatened race war), and espouses plainly racist and inflammatory rhetoric. When Mr. Doggrell's involvement with the League of the

South became an issue in 2009, he was warned to be careful and to avoid affiliating his employment as a police officer with the APD to his membership with the organization.

Completely disregarding this warning, Mr. Doggrell accepted an invitation to give a speech during the 2013 National Conference with the stated purpose of addressing the relationship between local police and the League of the South and the recruiting of police officers to the organization. Additionally, when Mr. Doggrell gave his 2013 speech, he openly shared his and a fellow officer's employment as APD Lieutenants and indicated that the APD supported his association with the League of the South. Mr. Doggrell more specifically attributed several statements to the APD Police Chief that reflected a positive view of the League of the South.

Further, when the SPLC's article was published and Mr. Doggrell's speech was posted on YouTube, it disrupted the operations of the APD and caused a public outcry.[17] The APD received numerous complaints and its Facebook account–used to

---

[17] Although Mr. Doggrell points out that Lt. Nicholas Bowles ("Lt. Bowles") testified that he and Police Chief Denham "were looking for something major and egregious in the video and . . . did not see that," (doc. 12-3 at 1 at 376 (The first set of page numbers to Doc. 12-3 corresponds with the Court's CM/ECF numbering system.)), Defendants have clarified through other testimony from Lt. Bowles the complete context of that statement made during the Civil Service Board hearing–that he and Police Chief Denham "were watching specifically for the 'N' word or anything inflammatory like that." (Doc. 14-2 at 4 at 14-15 (The first set of page numbers to Doc. 14-2 corresponds with the Court's CM/ECF numbering system.)); (*see also* Doc. 12-2 at 27 at 108 (testimony from Police Chief Denham indicating that when he "first watched the video [he] saw several things that [he] thought could cause problems and eventually did")). Therefore,

communicate with the community and to assist law enforcement in investigations–had to be shut down. Defendants were very concerned about violence breaking out within the City. Prior to his termination, Mr. Doggrell was given an opportunity to denounce the League of the South to hopefully reduce some of the community-wide tension caused by his speech and he declined to do so.

Therefore, under these facts, this Court concludes that Mr. Doggrell's "speech was not protected because [his] interest in speaking out was outweighed by the [A]PD's interests in maintaining order, loyalty, morale, and harmony [within the APD and throughout the community]." *Oladeinde*, 230 F.3d at 1294. Further, "[b]ecause [Mr. Doggrell] ha[s] not demonstrated a violation of a right protected by the First Amendment, [the Court] need not consider whether . . . [the termination of his employment] w[as] retaliatory." *Id.*; *see also Carney v. City of Dothan*, 158 F. Supp. 3d 1263, 1272, 1286 (M.D. Ala. 2016) (applying *Pickering* balancing principles and finding that "the scale tips in favor of the City" as the police officer's "Facebook statements [to comment on various topics] impaired the confidence of her fellow officers, garnering seventeen internal complaints"); *id.* at 1286 ("It is clear that the interests of the City of Dothan in ensuring efficient operation of the Department

---

Mr. Doggrell's opposing evidence fails to create a material factual dispute as to the perceived and actual disruption experienced by the APD in 2015 that were sparked by Mr. Doggrell's free speech activities in 2013.

outweigh the interests of [the police officer] in exercising her limited First Amendment rights.").

### C. Mr. Doggrell's Association Retaliation Claim Is Legally Deficient.

Mr. Doggrell also contends that his firing violated his freedom to associate under the First Amendment. (Doc. 14 at 22-25). Relying upon *Battle v. Mulholland*, 439 F.2d 321 (5th Cir. 1971),[18] Mr. Doggrell suggests that this Court should apply the *Pickering* balancing test to his association claim.[19] (*See* Doc. 14 at 24 ("The Court

---

[18]   In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[19]   In *McCabe v. Sharrett*, 12 F.3d 1558 (11th Cir. 1994, the plaintiff complained that she was transferred "to a less desirable job on account of her marriage to a . . . police officer . . . ." 12 F.3d at 1559. The Eleventh Circuit identified three potential ways to analyze that right to associate claim:

> the *Pickering* analysis, the *Elrod–Branti* analysis, and general strict scrutiny. As it turns out, we need not decide which of these analyses applies because we conclude that defendants are entitled to prevail regardless of which scheme we employ. However, to help explain why appellees are entitled to prevail under any of the possible analyses, we describe below each of the three schemes.

*McCabe*, 12 F.3d at 1564. Because neither side contends that the Court should utilize anything other than the *Pickering* standard and also because Mr. Doggrell's right is not tied to marriage or some other subset of "intimate association rights," 12 F.3d at 1566, the Court does not reach an analysis of Mr. Doggrell's association claim under either the *Elrod–Branti* or strict scrutiny model. *See Dunmar*, 43 F.3d at 599 ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." (citing *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990))); *see also Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir.1999) (declaring that a "party who aspires to oppose a summary judgment motion must spell out his arguments squarely and distinctly, or else forever hold his peace[,]" as "district court is free to disregard arguments that are not adequately developed[.]").

held that Battle did have a 42 U.S.C. § 1983 claim which would be subject to the

*Pickering* balancing test . . . .")).[20]

---

[20]   Much later in his brief, Mr. Doggrell states that "[f]reedom of association is subject to the closest of scrutiny . . . ." (Doc. 14 at 29). Mr. Doggrell cites to *Battle* and *Hatcher v. Bd. of Pub. Educ. & Orphanage for Bibb Cty*., 809 F.2d 1546 (11th Cir. 1987), as legal support for this proposition. *Battle* does not contain that language; however, *Hatcher* does:

> Appellees claim that appellant's attempts to bring others to her meeting with the superintendent and his assistant enjoyed no first amendment protection after *Connick* because the meetings were regarding a purely private concern: appellant's job assignment. We conclude, however, that *Connick* is inapplicable to freedom of association claims. *See Gavrilles v. O'Connor*, 579 F. Supp. 301, 304 n.* (D. Mass. 1984). We do not view *Connick* as a retreat from *NAACP v. Alabama*, 357 U.S. 449, 460–61, 78 S. Ct. 1163, 1171, 2 L. Ed. 2d 1488 (1958), in which Justice Harlan wrote for the Court:  "it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters ... <u>state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.</u>" Indeed, even a public employee's association choices as to whom to date enjoy constitutional protection. *Wilson v. Taylor*, 733 F.2d 1539 (11th Cir.1984). In short, application of a requirement that associational activity relate to a matter of public concern in order to be constitutionally protected would overturn Supreme Court and Eleventh Circuit jurisprudence and exact a substantial toll upon first amendment liberties. We conclude that no such requirement applies in this context and that appellant has satisfied the *Mt. Healthy* requirement that she demonstrate that she engaged in protected activity.

*Hatcher*, 809 F.2d at 1558 (footnote omitted) (emphasis added); *see also D'Angelo v. Sch. Bd. of Polk Cty.*, 497 F.3d 1203, 1212 (11th Cir. 2007) ("We have long held that, unlike speech or petitions by public employees, associational activity by public employees need not be on matters of public concern to be protected under the First Amendment."). Thus, Mr. Doggrell's reference to a "closest of scrutiny" standard stems from the *Hatcher* court's explanation why an actionable freedom of association claim has no matter of public concern component–an issue unchallenged by Defendants in Mr. Doggrell's case–and does not signify a retreat from the *Pickering* test. Additionally, the *Hatcher* court expressly acknowledges that *Pickering* balancing applies to freedom of association claims. 809 F.2d at 1559. Finally, to the extent that *Hatcher* suggests that the *Pickering* balance is to be determined by the trier of fact, 809 F.2d at 1559, that framework has since been modified by the Eleventh Circuit's application of *Garcetti*. *See, e.g., Moss*, 782 F.3d at 618 (explaining that public concern and competing interests prongs are legal matters to be decided by a court).

In *Battle*, the plaintiff police officer (who was black) claimed that he was unconstitutionally fired because he and his wife "had been allowing two white women who were working on an anti-poverty program to board at their home." 439 F.2d at 322. The *Battle* court did not explicitly describe the plaintiff's right as one of association but, instead, likened the plaintiff's claim to one regarding freedom of expression. *See Battle*, 439 F.2d at 324 ("Undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.") (internal quotation marks omitted); *id.* at 325 n.6 ("But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression."). However, a subsequent pre-*Bonner* Fifth Circuit case linked *Battle* more closely to the freedom to associate. *See Cook v. Hudson*, 511 F.2d 744, 751 (5th Cir. 1975) (citing *Battle* as support for the proposition that a public sector employer, under certain circumstances, can lawfully make "inquiry into <u>association activity</u> beyond that which would be proper as to the ordinary citizen or employee") (emphasis added)); *cf. also McCabe*, 12 F.3d at 1563 ("The right of expressive association—the freedom to associate for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion—is protected by the First Amendment as a necessary corollary of the rights that the amendment protects by its terms.").

The district court in *Battle* had granted summary judgment in favor of the defendants. In reversing the lower court, the Eleventh Circuit explained that the plaintiff had a right to prove that he was fired–a material disputed fact. 439 F.2d at 324. Further, if the plaintiff met that showing, "[t]he burden would then rest on the defendants of showing within standards applicable to police officers, similar to those suggested as to teachers in *Pickering*, *Tinker* and *Pred I*, *supra*, that Battle's conduct would materially and substantially impair his usefulness as a police officer." 439 F.2d at 325. *Battle* remains good law within the Eleventh Circuit.

Applying *Battle* and *Pickering* to the undisputed material facts in this case, the Court finds that Defendants have shown that Mr. Doggrell's continued association with the League of the South after the SPLC's publication revealed the contents of his 2013 speech "materially and substantially impair[ed] his usefulness as a police officer" with the APD. More specifically, Mr. Doggrell's 2013 speech directly intertwined his League of South association with his (and others') ADP employment <u>after</u> being expressly warned to keep his private membership in the League of the South separate from his public employment as a law enforcement officer.

Further, because that publicly-exposed association caused material harm to the APD's law enforcement activities, Mr. Doggrell's right to continue his association with the League of the South (1) conflicted with his ability to perform his job as a

police officer and (2) was outweighed by the City's right to dismiss him for that impairing affiliation. *Cf. Cole v. Choctaw Cty. Bd. of Ed.*, 471 F.2d 777, 779 (5th Cir. 1973) ("The school board cannot discharge public employees as a penalty for exercising their First Amendment rights <u>when such exercise is completely unrelated to and in no way conflicts with the performance of his job</u>." (emphasis added)). Thus, Mr. Doggrell's right to continued association with the League of the South was unprotected by the First Amendment.

Finally, akin to Mr. Doggrell's free speech claim, because his right to associate was not protected by the First Amendment under these circumstances, the Court does not need to address whether Defendants' motive for firing him was in retaliation for his association with the League of the South. *Oladeinde*, 230 F.3d at 1294.

Alternatively, the Court finds that to the extent Mr. Doggrell has adduced sufficient evidence to support a First Amendment violation of his right to associate, no reasonable jury could conclude, on these facts, that Mr. Doggrell's mere association with the League of the South (as opposed to the contents of his 2013 speech that disrupted the APD's operations when they became public) was a motivating or substantial factor in the decision to fire him. As the Second Circuit explained in a comparable teacher-firing case when the public employer had prior knowledge of the plaintiff's membership in the North American Man/Boy Love

Association ("NAMBLA"):

> Finally, Melzer insists that the Board's decision to terminate him is really motivated by a desire to retaliate against him for his NAMBLA membership, and not the disruption that his association causes. We find no proof in the record of retaliatory motive, nor was such evidence presented in any of the proceedings below. <u>The fact that the Board knew of Melzer's NAMBLA membership as early as the mid–1980s and did not terminate him until after his membership became public knowledge makes it highly implausible that a retaliatory motive was the lever for the Board's action dismissing him.</u>

*Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*, 336 F.3d 185, 199-200 (2d Cir. 2003) (emphasis added); *cf. also id.* at 200 (finding that although the plaintiff's "freedom to associate with and advocate for NAMBLA is protected by the First Amendment[,]" "[t]he Board nonetheless meets its burden under *Pickering* by demonstrating that plaintiff's association and his degree of active involvement in NAMBLA caused disruption to the school's mission and operations justifying the Board's action terminating him"). This Court is persuaded by *Melzer*'s reasoning and similarly concludes that, because Mr. Doggrell's membership in the League of the South was not an issue for the City in 2009 (so long as he kept his private membership separate from his public employment) and because Mr. Doggrell has conceded that Defendants acted in a measured manner after first receiving notice of his 2013 speech, "it makes it highly implausible that a retaliatory motive [due to Mr. Doggrell's association with the League of the South] was the lever for [Defendants']

action dismissing him." *Melzer*, 336 F.3d at 200.

Likewise, even if a reasonable jury could conclude that Mr. Doggrell's association with the League of the South was a motiving or substantial factor in the decision to fire him, the Court finds that Defendants, nonetheless, prevail as a matter of law on their *Mt. Healthy* defense–no reasonable jury could conclude anything but that Defendants would have fired Mr. Doggrell even in the absence of his protected associational activity. *Mt. Healthy*, 429 U.S. at 287, 97 S. Ct. at 576 ("Respondent having carried that burden [of showing constitutionally-protected conduct that played a substantial role in the adverse decision], . . . the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to [the adverse action] even in the absence of the protected conduct."). More specifically, the record shows that Defendants would have fired Mr. Doggrell for the disruption caused by contents of the speech that he gave in 2013 even if Mr. Doggrell had not been formally affiliated with the League of the South.

**D.    City Manager Johnson Is Entitled To Qualified Immunity.**

Mr. Doggrell has not demonstrated a violation of a right protected by the First Amendment. Thus, consistent with the Court's qualified immunity standard set out above, City Manager Johnson is entitled to qualified immunity due to the absence of

any unconstitutional conduct on his part. Alternatively, City Manager Johnson is entitled to qualified immunity because Mr. Doggrell has not carried his burden of showing that the unlawfulness of terminating his employment as a police officer under these circumstances was clearly established by preexisting binding precedent.

Moreover, "[b]ecause *Pickering* requires a balancing of competing interests on a case-by-case basis, . . . only in the rarest of cases will reasonable government officials truly know that the termination or discipline of a public employee violated 'clearly established' federal rights." *Hansen*, 19 F.3d at 576 (emphasis added). "[T]he employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the [act taken against] the employee was unlawful." *Id.* (alteration in original); *see also Lawrenz v. James*, 852 F. Supp. 986, 991 (M.D. Fla. 1994) ("Immunity is especially appropriate in cases where the employer's government agency is involved in quasi-military organizations such as law enforcement agencies . . . because law enforcement employees are entitled to less First Amendment protection than other government employees[.]" (citing *McMullen*, 754 F.2d at 938)), *aff'd*, 46 F.3d 70 (11th Cir. 1995); *cf. Gaines v. Wardynski*, __ F.3d __, No. 16-15583, 2017 WL 4173625, at *7 (11th Cir. Sept. 21, 2017) ("Because the case law that Gaines has relied upon was not particularized to the facts of the case, but rather it merely set out First Amendment principles at a high

level of generality, it was not 'apparent' that passing her over for promotion based on things her father said would violate her constitutional rights.") (emphasis added); *Gaines*, 2017 WL 4173625, at *7-8 (reversing district court's decision denying qualified immunity on freedom of speech and freedom of intimate association claims).

This situation is far from one that–in the words of *Hansen*–leads this Court to the "inevitable conclusion" that any unlawful activity occurred. No cases cited by Mr. Doggrell establish that City Manager Johnson violated Mr. Doggrell's First Amendment rights, much less that he clearly violated those rights. Instead, Mr. Doggrell's response to Defendants' qualified immunity contentions appears to concede that qualified immunity appropriately applies to City Manager Johnson in his individual capacity. (*See* Doc. 14 at 31 ("Since [City Manager Johnson] is the final decision maker, a suit against him in his official capacity is a suit against the City."); *id.* ("Qualified immunity does not bar equitable relief.")).

Accordingly, for these multiple reasons, the Court finds that Defendants' Motion is due to be granted as to Count I.

**E.    Mr. Doggrell Either Has Essentially Abandoned his ARFA Claim or, Alternatively, He Has No Cognizable Claim Under These Particular Circumstances.**

Count II of Mr. Doggrell's complaint asserts relief under the ARFA, Ala.

Const. Art. I, § 3.01. Defendants maintain that Mr. Doggrell cannot obtain relief under ARFA for two reasons. One, "[t]here is no precedent for plaintiff's claim for money damages based on an alleged burden of an individual's religious freedom in violation of [ARFA]." (Doc. 12 at 32). Two, "the undisputed facts do not support a finding that Plaintiff's freedom of religion has been burdened by Defendants in any regard, and certainly not through a 'rule,' whether of general applicability or otherwise." *Id.*

Concerning their first point, Defendants rely upon several cases that have found no authority to substantiate a private plaintiff's right to pursue money damages for alleged violations of the provisions of the Alabama Constitution. *See Matthews v. Alabama Agric. & Mech. Univ.*, 787 So. 2d 691, 698 (Ala. 2000) ("However, Matthews presented no authority to the trial court, and he has presented no authority to this Court, that recognizes a private cause of action for monetary damages based on violations of the provisions of the Constitution of Alabama of 1901, and we have found none."); *see also Ross v. Alabama*, 893 F. Supp. 1545, 1555 (M.D. Ala. 1995) ("The court has concerns as to whether a plaintiff may bring an action against a state employee in his or her individual capacity and seek monetary relief for violations of state *constitutional* law.") (emphasis in original); *Roberts v. City of Geneva*, 114 F. Supp. 2d 1199, 1215 (M.D. Ala. 2000) ("The Supreme Court of Alabama has held

that there is no authority that 'recognizes a private right of action for monetary damages based on violations of provisions of the Constitution of Alabama.'" (quoting *Matthews*, 787 So. 2d at 698)); *Tomberlin v. Clark*, 1 F. Supp. 3d 1213, 1234 (N.D. Ala. 2014) ("These [due process and other] claims fail because the Alabama constitution does not create a private right of action to sue for monetary damages.").

As for the second point, Defendants cite to *Presley v. Scott*, No. 4:13-CV-02067-LSC-TMP, 2014 WL 7146837 (N.D. Ala. Sept. 5, 2014), *report and recommendation adopted by district judge*, 2014 WL 7146837, at *6 (N.D. Ala. Dec. 15, 2014).[21] In *Presley*, a magistrate judge addressed ARFA in a case involving a prisoner who claimed that prison officials "confiscat[ed] and destroy[ed] his sacred religious items . . . ." *Id.* at *21. As explained by the *Presley* court, Section V of the ARFA provides in pertinent part:

> (b) Government may burden a person's freedom of religion only if it demonstrates that application of the burden to the person:
>
>> (1) Is in furtherance of a compelling governmental interest; and
>>
>> (2) Is the least restrictive means of furthering that compelling governmental interest.

---

[21] The Westlaw citation to *Presley* combines into one electronic document–2014 WL 7146837–the order entered by the district court judge addressing objections and accepting the magistrate judge's report and recommendation on December 15, 2014, followed by the magistrate judge's report and recommendation entered on September 5, 2014. This Court's substantive discussion of *Presley* references the magistrate judge's report and recommendation.

*Presley*, 2014 WL 7146837, at *24 (quoting Ala. Const. Art. I, § 3.01, § V(b)).

The *Presley* court further observed:

> Paragraph 3 of Section IV defines "Government," in part, as '[a]ny branch ... instrumentality, [or] official ... of the State of Alabama." Except for a single-judge dissent in *Ex parte Snider*, 929 So. 2d 447, 466 (Ala. 2005), a child-custody dispute, there is no other authoritative judicial interpretation of this broad language. There is no judicial construction of terms such as "compelling governmental interest." There is no explanation of how rigidly the term "burden" is to be used. Does the provision prohibit any burden on religion, regardless of how minor or trivial? There is no explanation of what "appropriate remedies" are available. Does this provision allow for monetary damages directly from the State coffers? Beyond very little, there is no Alabama case law providing guidance on what this constitutional provision really means.

*Presley*, 2014 WL 7146837, at *24;[22] *cf. Ex parte Snider*, 929 So. 2d at 466 (opining that "[t]he Alabama Constitution provides clear recognition of the inalienable right to worship God" and citing to ARFA) (Parker, J., dissenting); *Ex parte Snider*, 929 So. 2d at 466 ("Because the Alabama judicial system is a branch of civil government, the trial court's order is subject to this Amendment, which was designed to function as a strong wall protecting Alabamians' free exercise of religion from state

---

[22] The Court has located some other cases–besides *Presley* and *Ex parte Snider*–that mention and/or discuss ARFA, but all of them arise in the dissimilar context of an inmate's action under 42 U.S.C. § 1983, and all raise the even more distant issue of whether the Alabama Community Notification Act, Ala. Code §§ 15-20-1–15-20-5 (1975) (the predecessor statute to the Alabama Sex Offender Registration and Community Notification Act, Ala. Code §§ 15-20A-1–15-20A-48 (1975), pertaining to reporting requirements for sex offenders), *repealed by* Act 2011-640, § 49 (effective July 1, 2011), violates the ARFA.

interference.").[23]

In the absence of any state law precedent as to the meaning of ARFA, the *Presley* court decided to apply the standards used under the Religious Land use and Institutional Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc–1. RLUIPA requires that "governments that receive federal funding are prohibited from substantially burdening a prisoner's exercise of religion unless it has a compelling interest and employs the least restrictive means possible for protecting that interest" and "provides a private cause of action on behalf of any aggrieved prisoner[.]" 2014 WL 7146837, at *20. Applying the RLUIPA standards to the plaintiff's ARFA claim, the *Presley* court determined that the allegations of "wrongfully confiscating and destroying his religious items" were sufficient to require the defendants to respond to the claim. 2014 WL 7146837, at *24.

In response, Mr. Doggrell does not address any of the decisions cited by

---

[23] As the dissenting justice in *Ex parte Snider* further observed regarding ARFA:

> In fact, Alabama's constitutional protection of the right to worship God was designed to be stronger than that of the Constitution of the United States as interpreted by the United States Supreme Court. In response to, among other cases, *Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997), which struck down the federal Religious Freedom Restoration Act, Alabamians showed that our state motto—"We dare defend our rights"—is no mere slogan by ratifying the Alabama Religious Freedom Amendment in 1999.

*Ex parte Snider*, 929 So. 2d at 466 n.15.

Defendants, much less explain why his case is analogous to (or different from) those authorities. Instead, he contends that his ARFA claim is valid against the City because the ARFA provides that it is "to be liberally construed to effectuate its remedial and deterrent purposes" and it expressly gives a private party the right to assert a claim "in a judicial, or other proceeding and obtain appropriate relief against a government" to include a municipality.[24] (Doc. 14 at 32); Ala. Const. Art. I, § 3.01, § VII(a); *id.* § V(c).

He then vaguely ends this section of his brief by stating that "[b]ecause the Amendment specifically allows claims, the Plaintiff will be entitled to either an equitable or monetary claim as the Supreme Court of Alabama eventually rules." (Doc. 14 at 32). Because Mr. Doggrell has made no effort to address the cases cited by Defendants, suggest a *prima facie* and/or burden-shifting model for the Court to utilize when evaluating the merits of his claim, explain–with any detail–how the City's conduct <u>has burdened his freedom of religion in a legally meaningful manner under ARFA</u>, or describe what type of equitable or non-monetary relief he is seeking (in the event that Defendants are correct that ARFA claims, like other constitutional

---

[24] Thus, Mr. Doggrell's opposition to the Motion implicitly concedes that ARFA provides him with no recourse against City Manager Johnson in his individual capacity.

claims, will be limited to non-monetary relief),[25] the Court finds that he has essentially abandoned his ARFA claim.

Alternatively, the Court finds that a plain reading of ARFA's provisions clarifies that Mr. Doggrell's challenge of the City's employment decision is beyond ARFA's reach. The City's primary reason for discharging Mr. Doggrell is the community uproar resulting from the SPLC's making publicly known from his League of the South speech in 2013 that implicated the APD as a law enforcement agency with a sympathetic, if not a supportive, view of the League of the South's controversial mission and purpose. However, the City additionally terminated Mr. Doggrell's employment due to his violation of the ADP's anti-harassment policy in the form of a white "not-equal sign" with a black background posted on his public Facebook page which (as noted above) Mr. Doggrell has alleged symbolizes his opposition to homosexual marriage, a religious view he holds.

ARFA's purpose "is to guarantee that the freedom of religion is not burdened by state and local law; and to provide a claim or defense to persons whose religious freedom is burdened by government." Ala. Const., § 3.01, § III. Under ARFA, the

---

[25] The Court notes that in his prayer for relief at the end of Count II, Mr. Doggrell omits a direct reference to an equitable or non-monetary remedy and, instead, expressly seeks an award of compensatory, punitive damages, costs, and "various relief as this Court may deems just and proper." (Doc. 1-3 at 10).

City "shall not burden a person's freedom of religion <u>even if the burden results from</u> <u>a rule of general applicability</u> except . . . ." *Id.*, § V(a) (emphasis added). ARFA further defines "RULE" to mean "[a]ny government statute, regulation, ordinance, administrative provision, ruling guideline, requirement, or any statement of law whatever." *Id.*, § IV(4). Noticeably absent from this definition of "RULE" is a reference to policies that a government uses to manage its municipal employees. Because Mr. Doggrell has not identified <u>any ARFA-defined rule</u> invoked by the City that infringed upon or burdened (substantially or otherwise) his freedom of religion, he has no cognizable ARFA claim. *Cf. Presley*, 2014 WL 7146837, at *24 (relying upon federal framework under RLUIPA to evaluate plausibility of the plaintiff's religious-based claim asserted under ARFA); *id.* (finding that prison officials' alleged destruction of religious items plausibly places a <u>substantial</u> burden on a prisoner's exercise of religion and, thus, is sufficient to state a claim under ARFA") (emphasis added).

Alternatively, to the extent that Mr. Doggrell's facts pertaining to his firing are arguably sufficient to state a religious-based claim under ARFA, this Court finds that no reasonable factfinder could ever return a verdict in Mr. Doggrell's favor, *i.e.*, that the City unlawfullly burdened his religious freedom to oppose homosexual marriage when it (mistakenly or correctly) perceived Mr. Doggrell's posting of a white "not-

equal sign" with a black background to his public Facebook page as conveying a racist message that violated the City's anti-harassment policy applicable to police officers. Accordingly, for these multiple reasons, the Court finds that Defendants' Motion is due to be granted as to Count II.

## V. CONCLUSION

Thus, Defendants' Motion is due to be granted and, Mr. Doggrell's case is due to be dismissed with prejudice.[26] The Court will enter a separate final judgment order consistent with this memorandum opinion.

**DONE** this the 29th day of September, 2017.

_____

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[26] The Court acknowledges the parties' supplemental briefing on the issue of whether the Civil Service Board's decision to uphold City Manager Johnson's firing of Mr. Doggrell was sufficiently independent to cut off any liability of the City. (Docs. 22-23, 26). In *Jones v. City of Heflin*, 207 F. Supp. 3d 1255 (N.D. Ala. 2016), the Court rejected a similar municipal-based argument. *See id.* at 1274 ("Importantly, there is no indication that either body [*i.e.*, the Personnel Committee and the City Council] ever considered the merits of Mr. Jones's retaliation allegations and/or had the authority to set aside the decision to discharge Mr. Jones."); *id.* ("Instead, the narrower inquiry for both was limited to whether Mr. Jones had violated HPD policy as charged."); *cf. id.* at 1276 ("Here, this court finds that the City Council's termination hearing is more akin to the quasi-judicial review done by the civil service commission in *Hitt* than the civil service board's three-day comprehensive hearing in *Stimpson*."). However, the Court does not need to reach that issue here because the City prevails on summary judgment based upon Defendants' other arguments.